IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARAH B. KAUFFMAN, | No. 2:16-CV-2883-CMK |
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff, who is proceeding with retained counsel, brings this action under 42 U.S.C. § 405(g) for judicial review of a final decision of the Commissioner of Social Security. Pursuant to the written consent of all parties, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment. See 28 U.S.C. § 636(c). Pending before the court are plaintiff's motion for summary judgment (Doc. 19) and defendant's cross-motion for summary judgment (Doc. 25).

///

///

///

# I. PROCEDURAL HISTORY

Plaintiff applied for social security benefits on March 11, 2013. In the application, plaintiff claims that disability began on June 18, 2011. Plaintiff's claim was initially denied. Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on July 21, 2015, before Administrative Law Judge ("ALJ") Carol A. Eckersen. In an August 14, 2015, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1. The claimant has the following severe impairment(s): borderline personality disorder, depression, and irritable bowel syndrome;

2. The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

3. The claimant has the following residual functional capacity: the claimant can perform medium work; the claimant is capable of simple, repetitive semiskilled tasks, but not skilled tasks;

4. Considering the claimant's age, education, work experience, residual functional capacity, and vocational expert testimony, the claimant is capable of performing her past relevant work as a masseuse and school nurse.

After the Appeals Council declined review on October 13, 2016, this appeal followed.

# II. STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence. See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive. See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## III. DISCUSSION

In her motion for summary judgment, plaintiff argues: (1) the ALJ failed to properly evaluate the medical opinions; (2) the ALJ's mental residual functional capacity assessment is not supported by proper analysis or the record as a whole; (3) the ALJ's physical residual functional capacity assessment fails to discuss any limitations associated with irritable bowel syndrome, which is found to be severe; (4) the ALJ failed to articulate sufficient reasons for rejecting plaintiff's testimony as not credible; and (5) the ALJ failed to cite adequate reasons for rejecting lay witness testimony provided by plaintiff's boyfriend, Craig Whelah.

### A. **Evaluation of Medical Opinions**

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional. See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987). The least weight is given

to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  See id. at 831.

As to plaintiff's physical impairments, the ALJ relied on the opinions of state agency non-examining consulting physicians, who both concluded that plaintiff can perform medium work.  See CAR at Exhibits 1A, 3A.[1]  The ALJ also gave great weight to the opinion of consultative examining physician, Dr. Pathak.  See id. at Exhibit 10F.  Regarding Dr. Pathak, the

///

---

[1] Citations are to the Certified Administrative Record lodged on April 27, 2017 (Doc. 13).

4

ALJ stated:

> . . .He assessed functional limitations that are essentially the same as those included in the residual functional capacity assessment here. Dr. Pathak personally observed and examined the claimant. The positive objective findings in the medical evidence of record are from his examination of the claimant. His opinion is consistent with those objective findings, including only mild generalized tenderness of the abdomen, a negative straight leg raising test, normal examination of the shoulders, elbows, wrists, hands, fingers, hips, knees, ankles, and feet, normal circulation, full muscle strength, normal sensation, normal reflexes, and normal coordination.

Plaintiff raises no issues with respect to the ALJ's reliance on these opinions.

Plaintiff argues that the ALJ erred with respect to the medical opinions relating to her mental impairments and limitations. As to plaintiff's mental impairments, the ALJ again relied on the state agency non-examining doctors, see id. at Exhibits 1A, 3A, as well as the opinion of examining consultative professional, Dr. Liddell, see id. at Exhibit 7F. The ALJ rejected the opinions of plaintiff's treating physician, Dr. Emina. See id. at Exhibit 15F.

         1.      State Agency Doctors

In a September 4, 2013, assessment, state agency doctor Preston Davis, Psy.D., opined that plaintiff has a lack of insight, poor judgement, and poor decision-making ability. See CAR 102 & 106, Exhibit 1A. Dr. Davis also opined that plaintiff "can sustain her concentration, pace, & her persistence w/ her wk tasks for 2 hr blocks of time. . . ." Id. The doctor believed that plaintiff "would have difficulty coping with the stress of having to consistently interact w/ the general public or w/ cowrkers" and that plaintiff "can perform work tasks w/ little general public/cowrker contact." Id. Dr. Davis noted that the evidence was insufficient to determine whether plaintiff can perform her past relevant work, but opined that the evidence is sufficient to show that plaintiff can adjust to other work. See id. at 108, Exhibit 1A.

/ / /

/ / /

/ / /

In a January 7, 2014, assessment, state agency doctor Margaret Pollack, Ph.D., opined that plaintiff is capable of simple repetitive tasks with "some detailed (but not complex) work-like activity." CAR 117 & 119, Exhibit 3A. Dr. Pollack did not find any social restrictions. See id. The doctor concluded that plaintiff is moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. See id. at 122, Exhibit 3A. More specifically, Dr. Pollack opined that plaintiff is "capable of sustaining [concentration, persistence, and pace] for simple & some detailed (but not complex work-like activity)." Id.

Regarding the state agency doctors' opinions, the ALJ stated:

> . . .On initial review, they opined the claimant had moderate limitation with regard to working in coordination with others, interacting appropriately with the general public, getting along with coworkers or peers, and responding appropriately to changes in the work setting (Ex. 1A). On reconsideration, they opined the claimant had moderate limitation with regard to completing a normal workday and workweek (Ex. 3A). . . .

Though the ALJ recognized the doctors' differing opinions, the ALJ did not address the inconsistency. Specifically, the ALJ did not address the doctors' differing opinions as to social interaction limitations. Dr. Davis opined that plaintiff could only have limited contact with co-workers and the general public, while Dr. Pollack opined that plaintiff had no limitations with respect to social interactions. Similarly, the ALJ did not address differing opinions as to concentration, persistence, and pace. Dr. Davis opined that plaintiff could sustain concentration, persistence, and pace for only 2-hour blocks of time, while Dr. Pollack opined that plaintiff could sustain concentration, persistence, and pace with "some detailed (but not complex) work-like activity." Finally, despite having relied on these opinions, the ALJ included none of these limitations in plaintiff's residual functional capacity.

/ / /

/ / /

In purporting to give these doctors' opinions great weight, the ALJ provided a single reason – that the opinions are "consistent with the claimant's treatment records . . . and mental status examinations. . . ." See CAR 33. Logically, however, this reason cannot be sufficient for both doctors where the doctors did not express the same opinions. For example, either Dr. Davis' opinion that plaintiff has social interaction limitations is consistent with the treatment records and mental status examinations, or Dr. Pollack's opinion that plaintiff has no such limitations is consistent with the records and examinations. Both cannot be true. The ALJ's decision provides no way of knowing why social interaction limitations were not included in plaintiff's residual functional capacity. Likewise, the ALJ's decision provides no basis for reviewing the residual functional capacity assessment with respect to plaintiff's ability to maintain concentration, persistence, and pace.

The matter will be remanded to allow the ALJ to address the inconsistencies in the opinions of the state agency doctors and provide reasons for accepting or rejecting their opinions.

    2.    Dr. Liddell

Regarding Dr. Liddell, the ALJ stated:

> On August 11, 2013, Alysia Liddell, Ph.D., a psychologist, conducted a complete consultative psychiatric evaluation of the claimant (Ex. 7F). The claimant's chief complaints were borderline personality disorder, depression, ADD, and PTSD (Ex. 7F, p. 2). The claimant admitted to the continued use of cannabis. A mental status examination revealed a delayed response time, infrequent eye contact, cooperative behavior, and tight, logical, and goal oriented thought process (Ex. 7F, pp. 4-5). The claimant had appropriate thought content, severely depressed mood, mood congruent affect, normal memory, adequate concentration, and insight and judgment within normal limits (Ex. 7F, pp. 5-6). Based on the examination, Dr. Liddell diagnosed the claimant with bipolar one disorder without psychotic features, PTSD, ADD by history, polysubstance dependence, and borderline personality disorder. Dr. Liddell assessed a Global Assessment of Functioning (GAF) score of fifty, indicating serious symptoms or difficulty functioning. Dr. Liddell opined the claimant had a poor ability to understand, remember, and carry out detailed instructions, maintain attention and concentration, and deal with various changes in the work setting (Ex. 7F, pp. 6-7). . . .
>
>     * * *

> . . . Dr. Liddell personally observed and examined the claimant. The limitations assessed by Dr. Liddell are consistent with the claimant's treatment records. Although some mental status examinations revealed an anxious and depressed mood and blunted affect, the claimant exhibited a cooperative demeanor, speech within normal limits, linear thought process, normal thought content, and fair insight and judgment (Ex. 11F, pp. 34-35).

As plaintiff notes, though the ALJ purported to give great weight to Dr. Liddell's opinions, the ALJ did not discuss Dr. Liddell's opinions that plaintiff has poor ability to maintain attention and concentration, and deal with changes in the work setting, and neither of these limitations is included in the ALJ's assessment of plaintiff's residual functional capacity.[2]

The matter will be remanded to allow the ALJ to provide reasons for accepting or rejecting all of Dr. Liddell's opinions.

### 3. Dr. Emina

As to Dr. Emina, the ALJ stated:

> . . .Daniel Emina, M.D., completed a Medical Assessment of Ability to do Work Related Activities form on behalf of the claimant (Ex. 15F, p. 1). Dr. Emina opined the claimant had poor to no ability to follow work rules, deal with the public, interact with supervisors, deal with work stress or maintain attention and concentration. He opined the claimant had fair ability to relate to coworkers, use judgment and function independently.
>
> * * *
>
> I give little weight to the opinion of Dr. Emina (Ex. 15F). The severity of the limitations assessed by Dr. Emina are inconsistent with the claimant's record as a whole. The claimant indicated she experienced increased anxiety when around other people. However, the claimant mentioned she had recently had a birthday party for herself at her home, attended regular yoga classes, had attended a retreat for six weeks and had previously had multiple boyfriends. I have generously considered the claimant's subjective complaints of decreased concentration and focus and has [sic] limited the claimant to no more than semi-skilled work as part of the claimant's residual functional capacity.

///

---

[2] Dr. Liddell's opinion that plaintiff has poor ability to understand, remember, and carry out detailed instructions is included in the ALJ's conclusion that plaintiff has the residual functional capacity for simple repetitive semiskilled, but not skilled, tasks.

8

As with Dr. Liddell, Dr. Emina opined that plaintiff has, at best, poor ability to maintain concentration and deal with work stress. While the ALJ states that Dr. Emina's opinions are not consistent with the record, the ALJ fails to discuss this finding in the context of Dr. Liddell's similar opinions. Likewise, Dr. Emina also opined that plaintiff has, at best, poor ability to interact with the public, but the ALJ failed to discuss this opinion in the context of a similar opinion rendered by Dr. Davis.

The matter will be remanded to allow the ALJ to provide further analysis of Dr. Emina's opinions in the context of the record as a whole, particularly the similar opinions rendered by Drs. Liddell and Davis.

### B. <u>Mental Residual Functional Capacity</u>

In determining residual functional capacity, the ALJ must assess what the plaintiff can still do in light of both physical and mental limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities"). Where there is a colorable claim of mental impairment, the regulations require the ALJ to follow a special procedure. See 20 C.F.R. §§ 404.1520a(a), 416.920a(a). The ALJ is required to record pertinent findings and rate the degree of functional loss. See 20 C.F.R. §§ 404.1520a(b), 416.920a(b).

Plaintiff argues that the ALJ's finding that plaintiff can perform "up to semiskilled tasks" is not adequately explained. The ALJ found that plaintiff ". . .is capable of simple, repetitive tasks up to semiskilled, but not skilled tasks." According to plaintiff:

> Simple, repetitive tasks up to semiskilled tasks are generalized terms. One concludes a claimant has such a capacity after first assessing the capacities for the actual, underlying work activities. . . . The explanation of semiskilled work is in 20 C.F.R. § 404.1568(b). Nowhere does the decision provide the required, predicate evaluation of these to support its SRT/semiskilled capacity.

Plaintiff adds that the ALJ's decision ". . .gives no explanation for how moderate limitations in [concentration, persistence, and pace] translates to a capacity for both unskilled *and semiskilled*

9

work. . . ." Plaintiff also argues that the ALJ's mental residual functional capacity assessment is "at odds with the opinion evidence, including the opinion evidence it purports to rely on. . . ."

Given the errors identified above with respect to the ALJ's evaluation of the medical evidence, the court finds that plaintiff's objections to the ALJ's mental residual functional capacity assessment are well-founded. In particular, the ALJ has not addressed inconsistencies in the medical opinions as to plaintiff's ability to maintain concentration, persistence, and pace, and ability to interact with the general public and/or co-workers.[3]

### C. Physical Residual Functional Capacity

Residual functional capacity is what a person "can still do despite [the individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities"). Thus, residual functional capacity describes a person's exertional capabilities in light of his or her limitations.

Plaintiff argues that the ALJ erred by finding that plaintiff has severe irritable bowel syndrome but failing to include any limitations related to this severe impairment in the residual functional capacity assessment. The court does not agree. As discussed above, the ALJ relied on the opinions of the state agency doctors as well as Dr. Pathak – none of whom identified work-related limitations related to this impairment – and plaintiff does not challenge the ALJ's reliance on these opinions.

### D. Plaintiff's Credibility

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons. See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996). An explicit

---

[3] The court rejects defendant's argument that any errors are harmless because they do not change the outcome of the case. To the contrary, should limitations with respect to social interaction ultimately be found, such a limitation could preclude plaintiff from performing her past relevant work, but may not preclude other work.

credibility finding must be supported by specific, cogent reasons. See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990). General findings are insufficient. See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony. See id. Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing." See id.; see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc). As the Ninth Circuit explained in Smolen v. Chater:

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof. Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom. By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the Cotton test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.
>
> 80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions. See Bunnell, 947 F.2d at 345-47. In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms. See Smolen, 80 F.3d at 1284 (citations omitted). It is also appropriate to consider whether the

claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use. See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made. See Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

Regarding reliance on a claimant's daily activities to find testimony of disabling pain not credible, the Social Security Act does not require that disability claimants be utterly incapacitated. See Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989). The Ninth Circuit has repeatedly held that the ". . . mere fact that a plaintiff has carried out certain daily activities . . . does not . . .[necessarily] detract from her credibility as to her overall disability." See Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Heller, 260 F.3d 1044, 1050 (9th Cir. 2001)); see also Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986) (observing that a claim of pain-induced disability is not necessarily gainsaid by a capacity to engage in periodic restricted travel); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (concluding that the claimant was entitled to benefits based on constant leg and back pain despite the claimant's ability to cook meals and wash dishes); Fair, 885 F.2d at 603 (observing that "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication"). Daily activities must be such that they show that the claimant is ". . .able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." Fair, 885 F.2d at 603. The ALJ must make specific findings in this regard before relying on daily activities to find a claimant's pain testimony not credible. See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

As to plaintiff's statements and credibility, the ALJ stated:

> At the hearing, the claimant testified she last worked for a school district in 2011 as a physical education teacher. She mentioned she stopped working because the principal of the school did not recommend the

claimant return to teach the following school year. The claimant reported she had been supported by previous sexual partners. She mentioned the sexual partners would give her money based on the time she spent with them, usually in the range of approximately $300 an hour. The claimant testified her current boyfriend was helping support her. She mentioned she received approximately $785 a month in child support. The claimant testified she received $134 a month in Veteran's disability benefits. She indicated she felt she was no longer able to work as a teacher due to stress, anxiety when around other people, and sensitivity to noise and light.

The claimant alleged she could not work due to whole body pain with increased pain in her back, anxiety, severe food allergies, PTSD, and depression. She reported she experienced fibromyalgia pain flare-ups approximately three times a week for up to three days at a time. The claimant mentioned her fibromyalgia pain was aggravated by what she ate due to severe food sensitivity. She reported she spent approximately two to three hours a day lying in bed. The claimant mentioned she became irritable when she experienced anxiety. She reported she made herself vomit if she ate any type of meat, sugar, or any food that was not organic. The claimant contended she experienced tension, an increased pulse, sweating, shaking, and deep breathing when she experienced anxiety, which resulted in her experiencing pain and inflammation. She testified her anxiety was triggered by her PTSD symptoms. The claimant reported she had to lay down and meditate when she experienced anxiety symptoms. She indicated she usually had to lay down and meditate for one to three days to recover from anxiety symptoms, eating the wrong foods, and fibromyalgia pain flare-ups.

With regard to treatment, the claimant testified she received mental health treatment. The claimant mentioned she had a ten percent disability rating with the Veteran's administration due to scoliosis and back pain. She contended she had previously been prescribed medication for anxiety and depression. The claimant reported she had stopped taking prescription psychiatric medication in approximately 2012 because she was concerned about side effects and did not feel the medications were helping her. She indicated she attended a retreat for six weeks while weaning off the medications. The claimant reported she took several natural supplements. She mentioned she had sought treatment from a psychiatrist, chiropractor, natural medicine doctor, and massage therapists.

The claimant indicated her twelve-year-old daughter lived with her fifty percent of the time. She reported she had a valid drivers' license and did not have any problems with driving, although she experienced increased anxiety when she drove in traffic. The claimant mentioned she previously fainted while she was driving in August 2013, which caused her to experience some anxiety while driving. The claimant reported she had a license for marijuana approximately two years ago and had approximately six marijuana plants in her yard during that time. She mentioned she had previously used marijuana for pain and to help her sleep. The claimant testified she used marijuana approximately once or twice a month as of the date of the hearing. She reported the marijuana helped with body pain,

13

tension, muscle pain, and anxiety. The claimant contended she had recently had a fortieth birthday party for herself at her home. She indicated she prepared meals for her daughter and helped her get ready and took her to school and daycare. The claimant mentioned she attended yoga classes approximately three days a week lasting an hour and a half. She reported she rested for an extra five minutes of the ninety-minute classes. The claimant testified she walked for approximately twenty minutes once a week.

In addition to the claimant's testimony and statements of record, I have read and considered the Adult Function Report completed by the claimant on May 24, 2013, and find her to be only partially credible for the reasons discussed herein (Ex. 4E). The claimant indicated she experienced insomnia, fatigue, and aches and pain from chronic inflammation throughout her body (Ex. 4E, p. 1). She reported she suffered from irritable bowel syndrome which caused cramps that required her to lay down. The claimant mentioned she was unable to deal with stress due to renal failure. She contended she experienced depression, irritability, and moodiness. The claimant indicated she suffered from borderline personality disorder which caused her to say and do things that were not appropriate in the work place. She reported she took her daughters to and from school each day (Ex. 4E, p. 2). The claimant mentioned she helped her daughters with their homework and prepared some of their meals. She contended she received assistance from a roommate with caring for pets. The claimant indicated she experienced difficulty sleeping due to back pain, body aches, and insomnia. She reported she sometimes required reminders to perform personal grooming activities and take medications (Ex. 4E, p. 3). The claimant mentioned she prepared simple meals and performed some light household chores. She contended she could go places alone and was able to drive a vehicle (Ex. 4E, p. 4). The claimant indicated she went shopping approximately twice a week. She reported she spent time reading, performing yoga, and walking (Ex. 4E, p. 5). The claimant mentioned she attended festivals once every few months and attending church services once a month. She indicated she experienced difficulty getting along with others due to irritability, depression, PTSD, and borderline personality (Ex. 4E, p. 6). The claimant alleged difficulty with lifting, squatting, bending, reaching, sitting, kneeling, memory, concentration, and getting along with others. She reported she could not lift more than twenty pounds, could walk for approximately thirty minutes and would then need to rest for five to fifteen minutes, and could pay attention for approximately ten minutes. The claimant mentioned she sometimes did not finish what she started. She contended she had been fired from previous jobs for telling an inappropriate joke to a boss and making inappropriate comments (Ex. 4E, p. 7). The claimant indicated she did not handle stress or changes in routine well.

The credibility of the claimant's allegations regarding the severity of her symptoms and limitations is diminished because those allegations are greater than expected in light of the objective evidence of record.

Although the claimant's activities of daily living were somewhat limited,

some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment and are inconsistent with the presence of an incapacitating or debilitating condition. The claimant indicated she could prepare simple meals, perform some household chores, care for her daughter, shop and drive a vehicle (Testimony and Ex. 4E). Additionally, the claimant mentioned she had previously had multiple boyfriends, attended regular yoga classes, helped her daughter with her homework, and had attended a retreat for six weeks. The claimant's ability to participate in such activities undermined the credibility of the claimant's allegations of disability functional limitations.

The clamant has not generally received the type of medical treatment one would expect for a totally disabled individual. On August 23, 2013, physical examination of the claimant revealed only mild generalized tenderness of the abdomen, a negative straight leg raising test, normal examination of the shoulders, elbows, wrists, hands, fingers, hips, knees, ankles, and feet, normal circulation, full muscle strength, normal sensation, normal reflexes, and normal coordination (Ex. 10F, pp. 4-5). On December 13, 2013, physical examination revealed unremarkable findings (Ex. 11F, p. 49). On October 21, 2014, the claimant indicated she had been doing coffee enemas and was undergoing a master cleanse (Ex. 13F, p. 4). Physical examination revealed normal findings. On June 10, 2011, the claimant indicated her anger had decreased since her previous visit and reported no depressive symptoms (Ex. 3F, p. 87). On September 6, 2011, the claimant indicated she was weaning herself off her prescription of Wellbutrin because she had been exercising, eating well, and was feeling better (Ex. 3F, p. 100). On December 11, 2012, the claimant indicated she felt she did not need treatment (Ex. 4F, p. 21). She mentioned she felt her mood was stable and reported good sleep and a low normal appetite. A mental status examination revealed cooperative demeanor, normal speech, good mood, euthymic affect, logical and linear thought process, normal thought content, no psychosis, and good insight and judgment (Ex. 4F, p. 24). Although a mental status examination on March 25, 2013, revealed a depressed mood and affect, the claimant had spontaneous speech, linear thought process, normal thought content, and fair insight and judgment (Ex. 4F, pp. 10-11). On March 29, 2013, the claimant presented with chronic mood and mood congruent affect (Ex. 4F, p. 5). On April 8, 2013, the claimant indicated she was doing better and was doing yoga (Ex. 11F, p. 65). Although an August 11, 2013, mental status examination revealed a delayed response time, depressed mood, mood congruent affect, and infrequent eye contact, the claimant had cooperative behavior, tight, logical and goal oriented thought process, appropriate thought content, normal memory, adequate concentration, and insight and judgment within normal limits (Ex. 7F). On December 15, 2014, the claimant reported her depression had improved with proper nutrition, cleansing/detox, stress reduction, and atlas adjustment (Ex. 12F, p. 3). The claimant mentioned she exercised regularly. On January 9, 2015, the claimant was noted as having minimal depressive symptoms and was noted as not having taken psychiatric medications in some time (Ex. 17F, p. 7). These findings are inconsistent with the alleged severity of her

15

symptoms and functional limitations and diminishes the credibility of those allegations.

Plaintiff argues that, contrary to the ALJ's assessment, her activities of daily living do not show a capacity for work. Plaintiff also argues that the ALJ fails to explain how her treatment records undermine her allegations.

1. Activities of Daily Living

The ALJ found that plaintiff's allegations of disabling symptoms are undermined by activities of daily living which "are the same as those necessary for obtaining and maintaining employment." Specifically, the ALJ noted that plaintiff prepares simple meals, does some household chores, attends yoga classes, helps her daughter with homework, drives, and shops. The ALJ also noted that plaintiff had attended a six-week retreat. As the ALJ noted, these activities indicate an ability to do some work-related activities, such as following procedures required to prepare meals, maintaining the pace necessary to complete household chores, and maintaining concentration to assist her daughter with homework. Similarly, plaintiff's ability to drive, shop, and attend yoga classes reveal an ability to maintain a schedule and interact with others. The court finds no error in the ALJ's reliance on plaintiff's daily activities to discredit her allegations of totally disabling limitations.

2. Treatment Records

Plaintiff offers no explanation for her argument that the ALJ erred by citing her treatment records. As the ALJ noted, plaintiff's treatment records consistently show relatively benign objective findings. Additionally, the records document that plaintiff's symptoms improved with conservative treatment and that plaintiff reported doing better despite non-compliance with prescribed psychiatric medications.

D.  **Lay Witness Testimony**

In determining whether a claimant is disabled, an ALJ generally must consider lay witness testimony concerning a claimant's ability to work. See Dodrill v. Shalala, 12 F.3d 915,

16

919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e). Indeed, "lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment." See Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996). Consequently, "[i]f the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." Dodrill, 12 F.3d at 919. The ALJ may cite same reasons for rejecting plaintiff's statements to reject third-party statements where the statements are similar. See Valentine v. Commissioner Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) (approving rejection of a third-party family member's testimony, which was similar to the claimant's, for the same reasons given for rejection of the claimant's complaints).

As to statements from plaintiff's boyfriend, Mr. Whelah, the ALJ stated:

> I have also considered the Third Party Function Report completed on May 23, 2013, by the claimant's boyfriend, Craig Whelah (Ex. 3E). The claimant's boyfriend indicated the claimant experienced decreased focus and concentration and frustration (Ex. 3E, p. 1). He reported the claimant had to have things her way, did not like to share her emotions, was very secretive, lacked trust, did not like to discuss her daily activities, and alienated people who loved her. He reported the claimant cared for her daughter on a part time basis (Ex. 3E, p. 2). The claimant's boyfriend indicated he assisted with caring for the claimant's daughter and pet dog. He mentioned the claimant experienced difficulty sleeping due to restlessness, irritability, and stress. The claimant's boyfriend contended the claimant required reminders to perform personal grooming activities (Ex. 3E, p. 3). He indicated the claimant prepared meals and washed her own laundry. The claimant's boyfriend reported he maintained the claimant's yard and home. He mentioned the claimant could go places alone and could drive a vehicle (Ex. 3E, p. 4). The claimant's boyfriend contended the claimant went shopping. He indicated the claimant spent time reading, researching about nutrition, and performing yoga (Ex. 3E, p. 5). The claimant's boyfriend reported the claimant experienced difficulty getting along with others due to depression, lack of ambition, and critical behavior (Ex. 3E, p. 6). He alleged the claimant experienced difficulty with completing tasks, concentration, understanding, following instructions, and getting along with others. The claimant's boyfriend mentioned the claimant finished what she started and had difficulty with spoken instructions. He contended the claimant did not handle stress or changes in routine well (Ex. 3E, p. 7).
>
> The claimant's boyfriend is not a medical professional. As a lay witness, he is not competent to make a diagnosis or argue the severity of the

claimant's symptoms. According to the questionnaire, he is assisting the claimant physically and emotionally. Therefore, the claimant's boyfriend has a familial interest in seeing the claimant receive benefits and his opinion is not an unbiased one. Most important, the clinical or diagnostic medical evidence . . . does not support his statements. The claimant's medical records document improved mental health symptoms with treatment and grossly conservative physical medical treatment. I find the statements of the claimant's boyfriend are not credible to the extent his statements are inconsistent with the determination herein.

In this case, the ALJ did not err by rejecting Mr. Whelah's statements for the same reasons cited for rejecting plaintiff's allegations. In particular, plaintiff's treatment records show improvement with conservative treatment despite non-compliance with prescribed medications.

### IV. CONCLUSION

For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and/or further findings addressing the deficiencies noted above.

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (Doc. 19) is granted;
2. Defendant's cross motion for summary judgment (Doc. 25) is denied;
3. This matter is remanded for further proceedings consistent with this order; and
4. The Clerk of the Court is directed to enter judgment and close this file.

DATED: March 13, 2018

CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE